AMAZON PETROLEUM CORPORATION et al. v. RAILROAD COMMISSION OF TEXAS et al.

PANAMA REFINING CO. et al. v. RYAN et al.

Nos. 632, 635.

District Court, E. D. Texas, Tyler Division.

Feb. 12, 1934.

See, also (D. C.) 5 F. Supp. 633.

Saye, Smead & Saye, of Longview, Tex., F. W. Fischer, of Tyler, Tex., and W. Edward Lee, of Longview, Tex., for plaintiffs.

James V. Allred, Atty. Gen., for defendant Railroad Commission.

Charles I. Francis and Douglas Arant, Sp. Assts. to the Atty. Gen., for defendants Ryan and others.

BRYANT, District Judge.

In these related cases complainants attack the validity of an act of Congress known as the National Industrial Recovery Act (48 Stat. 195), and certain regulations of the Secretary of the Interior, the provisions of the Code for the petroleum industry established under the act, upon constitutional grounds.

In the Anding & Panama Refining Company cases, a rule to show cause was issued returnable October 2, calling upon the respondents Ryan et al. to show cause why a preliminary injunction should not be granted as prayed. On the hearing upon this rule, and the respondent's answer thereto, the rule was discharged and the application for preliminary injunction denied. The cause was thereupon set for final hearing upon November 6th. Shortly thereafter, a similar attack was made upon the statute and the regulations by the complainants in the other cases listed above, in which the individual members of the Railroad Commission of Texas, their agents, the Attorney General of Texas, and various district and county attorneys of the state were made respondents, and in which the complainants, invoking the Fourteenth Amendment, sought injunctive relief, interlocutory and final, to restrain enforcement against them of certain orders of the Railroad Commission limiting their production of oil.

It appearing that the latter cause of action presented a case for three judges, a statutory court was ordered assembled to pass upon the constitutional question raised.

The statutory court in limine suggested its want of jurisdiction over the cause of action against the federal respondents as not within 28 USCA § 380, and decided that such cause of action was for the consideration of the District Judge alone.

All parties desiring the application to be heard and determined as to both causes of action, it was in open court stated and agreed to by all parties, and the judges consenting, made matter of record, that each cause should be regarded as submitted to and to be decided by the tribunal having jurisdiction of it. It was further stipulated of record in the latter suits filed that the suits be submitted on the evidence taken at such hearing, both on the application for interlocutory injunction and on the merits.

The pertinent portions of the act of Congress involved are as follows:

"An Act to encourage national industrial recovery, to foster fair competition, and to provide for the construction of certain useful public works, and for other purposes.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

"TITLE I—INDUSTRIAL RECOVERY

"Declaration of Policy

"§ 1. A national emergency productive of widespread unemployment and disorganization of industry which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist. It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by in-

creasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources.

## "Administrative Agencies

"§ 2. (a) To effectuate the policy of this title, the President is hereby authorized to establish such agencies, to accept and utilize such voluntary and uncompensated services, to appoint, without regard to the provisions of the civil service laws, such officers and employees, and to utilize such Federal officers and employees, and, with the consent of the State, such State and local officers and employees, as he may find necessary, to prescribe their authorities, duties, responsibilities, and tenure, and, without regard to the Classification Act of 1923, as amended, to fix the compensation of any officers and employees so appointed.

"(b) The President may delegate any of his functions and powers under this title to such officers, agents, and employees as he may designate or appoint, and may establish an industrial planning and research agency to aid in carrying out his functions under this title.

"(c) This title shall cease to be in effect and any agencies established hereunder shall cease to exist at the expiration of two years after the date of enactment of this Act, or sooner if the President shall by proclamation or the Congress shall by joint resolution declare that the emergency recognized by section 1 has ended.

## "Codes of Fair Competition

"§ 3. (a) Upon the application to the President by one or more trade or industrial associations or groups, the President may approve a code or codes of fair competition for the trade or industry or subdivision thereof, represented by the applicant or applicants, if the President finds (1) that such associations or groups impose no inequitable restrictions on admission to membership therein and are truly representative of such trades or industries or subdivisions thereof, and (2) that such code or codes are not designed to promote monopolies or to eliminate or oppress small enterprises and will not operate to discriminate against them, and will tend to effectuate the policy of this title: Provided, That such code or codes shall not permit monopolies or monopolistic practices: Provided further, That where such code or codes affect the services and welfare of persons engaged in other steps of the economic process,

nothing in this section shall deprive such persons of the right to be heard prior to approval by the President of such code or codes. The President may, as a condition of his approval of any such code, impose such conditions (including requirements for the making of reports and the keeping of accounts) for the protection of consumers, competitors, employees, and others, and in furtherance of the public interest, and may provide such exceptions to and exemptions from the provisions of such code, as the President in his discretion deems necessary to effectuate the policy herein declared.

"(b) After the President shall have approved any such code, the provisions of such code shall be the standards of fair competition for such trade or industry or subdivision thereof. Any violation of such standards in any transaction in or affecting interstate or foreign commerce shall be deemed an unfair method of competition in commerce within the meaning of the Federal Trade Commission Act, as amended; but nothing in this title shall be construed to impair the powers of the Federal Trade Commission under such Act, as amended.

"(c) The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of any code of fair competition approved under this title; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations.

"(d) Upon his own motion, or if complaint is made to the President that abuses inimical to the public interest and contrary to the policy herein declared are prevalent in any trade or industry or subdivision thereof, and if no code of fair competition therefor has theretofore been approved by the President, the President, after such public notice and hearing as he shall specify, may prescribe and approve a code of fair competition for such trade or industry or subdivision thereof, which shall have the same effect as a code of fair competition approved by the President under subsection (a) of this section. * * *

"(f) When a code of fair competition has been approved or prescribed by the President under this title, any violation of any provision thereof in any transaction in or affecting interstate or foreign commerce shall be a misdemeanor and upon conviction thereof an offender shall be fined not more than

$500 for each offense, and each day such violation continues shall be deemed a separate offense. *. * *

## "Oil Regulation

"§ 9. (a) The President is further authorized to initiate before the Interstate Commerce Commission proceedings necessary to prescribe regulations to control the operations of oil pipe lines and to fix reasonable, compensatory rates for the transportation of petroleum and its products by pipe lines, and the Interstate Commerce Commission shall grant preference to the hearings and determination of such cases.

"(b) The President is authorized to institute proceedings to divorce from any holding company any pipe-line company controlled by such holding company which pipe-line company by unfair practices or by exorbitant rates in the transportation of petroleum or its products tends to create a monopoly.

"(c) The President is authorized to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State. Any violation of any order of the President issued under the provisions of this subsection shall be punishable by fine of not to exceed $1,000, or imprisonment for not to exceed six months, or both.

## "Rules and Regulations

"§ 10. (a) The President is authorized to prescribe such rules and regulations as may be necessary to carry out the purposes of this title, and fees for licenses and for filing codes of fair competition and agreements, and any violation of any such rule or regulation shall be punishable by fine of not to exceed $500, or imprisonment for not to exceed six months, or both.

"(b) The President may from time to time cancel or modify any order, approval, license, rule, or regulation issued under this title; and each agreement, code of fair competition, or license approved, prescribed, or issued under this title shall contain an express provision to that effect." (15 USCA §§ 701–703 (a–e, f), 709, 710).

The President, pursuant to the claim of power granted to him by said section 9 (c), 15 USCA § 709 (c), issued an Executive Order prohibiting the transportation in interstate and foreign commerce of all petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any state law or valid regulation or order prescribed thereunder by any board, commission, officer, or other duly authorized agency of the state.

The President duly delegated to the Secretary of the Interior his power and functions by Executive Order and authorized the Secretary of the Interior to make all necessary or desirable rules or regulations.

Thereafter, the Secretary of the Interior issued rules and regulations purporting to effectuate said Executive Order and section 9 (c) of the act. It is paragraphs 4 and 5 of these rules and regulations which are attacked in the present suits, and they provide substantially as follows:

Regulation 4 requires each producer of petroleum to file a statement under oath not later than the 15th day of each month with the Division of Investigations of the Department of Interior, giving: (1) The residence and post office address of the producer; (2) the location of his producing properties and wells, the allowable production therefor as fixed by the state agency; (3) the daily production in barrels; (4) details of deliveries of petroleum and the amount in storage at the beginning and end of the month; and (5) a declaration that no part of the petroleum or products thereof produced and shipped has been produced or withdrawn in violation of state law or valid regulation.

Regulation 5 requires every refiner to file a statement not later than the 15th of each month, with said Division of Investigations, containing the following information: (1) The residence and post office address of the refiner; (2) the place and date of receipt, with names and business addresses of the producers or parties from whom the petroleum was received, the amount received, and the amount held in storage on the last day of the calendar month preceding the period covered by the report; (3) details as to the disposition of said petroleum and the amount held in storage or otherwise at the end of said calendar month; (4) a declaration that to the best of the information and belief of the affiant, none of the petroleum, received or disposed of, was produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by state law or valid regulation.

The Code of Fair Competition, as provided for in section 3 (a) of the act, 15 USCA

§ 703 (a), as it relates to the petroleum industry, provides among other things as follows:

(a) That complainants and other producers engaged in the producing of oil shall pay their employees not less than a specified wage;

(b) Shall not work their employees in excess of a specified number of hours per day;

(c) That all employees engaged in similar work shall work the same number of hours, and be paid at least a specified wage, the hours of service and rates of pay being subject to change by the President;

(d) That complainants, and all persons subject to the code, shall insert in all contracts made by them, for work to be done in the industry, whereby the contractor shall agree that all of his employees, and all employees of any subcontractor shall be paid the rates prescribed by said code, and that the schedule of hours of all such employees conform to these prescribed by said code;

(e) That complainants, and other members of said industry, shall not, as a condition of employment, require any employee or any one seeking employment to join any union or refrain from joining any union or labor organization;

(f) That complainants, and other oil producers, be prohibited from storing oil or withdrawing oil from storage without the consent and approval of a planning and coordinating committee appointed by the President;

(g) That not in excess of 100,000 barrels of oil shall be withdrawn from storage in the United States on any day;

(h) That required production of oil to balance consumer demand for petroleum products shall be estimated by a federal agency designated by the President; that allocation of such requirements shall be made among the states, and no state shall be permitted to produce in excess of such allocation, all allocations to be approved by the President.

The general claim of complainants as against respondents is substantially as follows: That the complainants (producers) are not engaged in shipping any oil either intrastate or interstate, but are engaged solely in the business of producing and marketing oil. The oil is sold by them on their respective leases and title to such oil passes from complainants upon its being delivered to buyers on the premises where it is being produced. They further claim that the respond-

ents are purporting to act under authority conferred by the National Recovery Act, the Executive Order above referred to, and that the President, assuming to act in his official capacity but without any authority whatever, approved and promulgated what is known as the Code of Fair Competition for the Petroleum Industry, and that by the Executive Order referred to, he attempted to delegate to the Secretary of the Interior full power and authority to enforce and carry into effect the provisions of the National Recovery Act relating to the petroleum industry. That the respondents are attempting to enforce the aforesaid code and orders as against these complainants and as an incident to such enforcement are demanding of and compelling complainants to furnish them with reports required by the regulations referred to above, and that as an incident to the enforcement of such demand, they make repeated inspections of complainants' properties and gauge their tanks to ascertain the amount of oil being produced by them. That certain respondents, incident to such visitations, have dug up and destroyed certain property about complainants' premises, and will in the future continue to assert such rights of visitation and inspection and invasion of complainants' property rights unless restrained from so doing; that the federal officers have stated that if the complainants do not comply with said orders and regulations and provisions of the code, they will cause them to be arrested and prosecuted under section 9 (c) of the National Recovery Act (15 US CA § 709 (c), and that unless restrained said federal officers will institute and prosecute actions, both civil and criminal, against the complainants, which will result in irreparable injury and damage to complainants, for which they have no adequate remedy at law.

The only difference in the case made as to the refiners is that they are engaged exclusively in the production and manufacture of products from crude petroleum; that they are not engaged in interstate commerce; and that none of their products when sold by them go into the channels of interstate commerce.

The evidence is without contradiction that the complainants in this case are not actually engaged in interstate commerce.

The claim is made that the provisions of the National Recovery Act, code, and regulations, are null and void because:

(a) It is an attempt by Congress to delegate its legislative powers to the President.

(b) It is an attempt by Congress to vest in the President the powers of a supreme

dictator, contrary to the national Constitution, and contrary to our republican form of government.

(c) It authorizes the President to exercise police powers not granted to the national government by the several states of the Union, and is in violation of the Tenth Amendment to the national Constitution.

(d) It deprives complainants of their natural and inherent rights contrary to the Ninth Amendment to the national Constitution.

(e) It deprives complainants of their property without due process of law, in violation of the Fifth Amendment to the national Constitution.

(f) It violates both the Fourth and Fifth Amendments to the national Constitution, in that it attempts to give the Federal government the right to compel the complainants and others to produce their papers and effects, compels them to give evidence against themselves, and deprives them of liberty and property without due process of law.

(g) It is contrary to the Eighth Amendment to the national Constitution, in that it imposes excessive fines and cruel and unusual punishment.

To this claim of right by complainants, respondents answer by saying in general that under a declared emergency, the powers of Congress are expanded beyond their extent under ordinary circumstances, and in ordinary times, and that under the Commerce Clause, the federal government has the power to control the production of petroleum, and that while ordinarily the production of oil or refining thereof is not interstate commerce, that this may so affect interstate commerce so as to come within the regulatory power of Congress. That the act does not constitute an unlawful delegation of legislative power and is valid.

The majority opinion this day filed has adjudged that the orders of the Railroad Commission of Texas are valid. 5 F. Supp. 633.

For the purposes of this opinion, it may be conceded that Congress may prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted. The further, exceedingly doubtful concession may be made that the act does not delegate legislative power and authority to the President, so that the essential point for decision is as to the validity of the regulations issued by the Secretary of the Interior and the provisions of the code and their binding effect, if any, upon the complainants, under the facts disclosed in this matter.

The above concessions and assumptions are indulged because I have reached the conclusion that the regulations and the code provisions involved have no constitutional basis as applied to the facts of this case.

This is another of those cases which have so frequently engaged the attention of the national courts involving as it essentially does a contest between state and federal authority and more particularly the extent to which the federal government may go in its exercise of authority in regulation of matters ordinarily committed to the regulation of the states.

Owing to the apparent importance of the matter, a statement of my reasons for the conclusion reached is deemed proper.

It has been decided specifically and unequivocally by the Supreme Court that mining is not interstate commerce and the power of Congress does not extend to its regulation as such. United Mine Workers of America v. Coronado Coal Company, 259 U. S. 344, 407, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762. Champlin Refining Co. v. Corp. Comm., 286 U. S. 210, 52 S. Ct. 559, 76 L. Ed. 1062, 86 A. L. R. 403.

As said by the Supreme Court in Oliver Iron Mining Co. v. Lord, 262 U. S. 172, 178, 43 S. Ct. 526, 529, 67 L. Ed. 929: "Mining is not interstate commerce, but like manufacturing, is a local business, subject to local regulation and taxation. * * * Its character in this regard is intrinsic, is not affected by the intended use or disposal of the product, is not controlled by contractual engagements, and persists even though the business be conducted in close connection with interstate commerce."

The decisions of the Supreme Court further show that the making or manufacturing of goods are not commerce, nor does the fact that these things are to be afterward shipped or used in interstate commerce make their production a part thereof. Hammer v. Dagenhart, 247 U. S. 251, 272, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724.

The Supreme Court said in the famous Child Labor Case, 247 U. S. 251, 38 S. Ct. 529, 532, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724: "The control by Congress over interstate commerce cannot authorize the exercise of authority not entrusted to it by the Constitution. Pipe Line Case, 234 U. S. 548, 560, 34 S. Ct. 956, 58 L. Ed. 1459.

The maintenance of the authority of the States over matters purely local is as essential to the preservation of our institutions as is the conservation of the supremacy of the federal power in all matters entrusted to the nation by the federal Constitution. In interpreting the Constitution it must never be forgotten that the nation is made up of states to which are entrusted the powers of local government. And to them and to the people the powers not expressly delegated to the national government are reserved. Lane County v. Oregon, 7 Wall. 71, 76, 19 L. Ed. 101. The power of the states to regulate their purely internal affairs by such laws as seem wise to the local authority is inherent and has never been surrendered to the general government. ⁘ ⁑ ＊ This court has no more important function than that which devolves upon it the obligation to preserve inviolate the constitutional limitations upon the exercise of authority federal and state to the end that each may continue to discharge, harmoniously with the other, the duties entrusted to it by the Constitution."

As said in Ohio Oil Company v. Indiana, 177 U. S. 190, 211, 212, 20 S. Ct. 576, 585, 44 L. Ed. 729: "In view of the fact that regulations of natural deposits of oil and gas and the right of the owner to take them as an incident of title in fee to the surface of the earth, as said by the supreme court of Indiana, is ultimately but a regulation of real property, and they must hence be treated as relating to the preservation and protection of rights of an essentially local character."

In the case of Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 8, 32 L. Ed. 346, the Supreme Court, in discussing the extent of the authority of the federal government under the commerce clause, among other things said: "The line which separates the province of federal authority over the regulation of commerce from the powers reserved to the states, has engaged the attention of this court in a great number and variety of cases. The decisions in these cases, though they do not in a single instance assume to trace that line throughout its entire extent, or to state any rule further than to locate the line in each particular case as it arises, have almost uniformly adhered to the fundamental principles which Chief Justice Marshall, in the case of Gibbons v. Ogden, 9 Wheat. 1 [6 L. Ed. 23], laid down as to the nature and extent of the grant of power to congress on this subject, and also of the limitations, express and implied, which it imposes upon state legislation with regard to taxation, to the control of domestic commerce, and to all persons and

things within its limits of purely internal concern. ⁘ ＊ ⁑ No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and commerce. Manufacture is transformation—the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation. ＊ ⁑ ⁙ 'Commerce with foreign nations and among the states, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities.' If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that congress would be invested, to the exclusion of the states, with the power to regulate, not only manufacture, but also agriculture, horticulture, stock-raising, domestic fisheries, mining—in short every branch of human industry. ⁙ ⁙ ⁙ It was said by Chief Justice Marshall that it is a matter of public history that the object of vesting in congress the power to regulate commerce with foreign nations and among the several states was to insure uniformity of regulation against conflicting and discriminating state legislation."

The Supreme Court again in the case of County of Mobile v. Kimball, 102 U. S. 692, 26 L. Ed. 238, laid down the rule as to the constitutional limitations of Congress under the Commerce Clause, in which it held that the power of Congress to regulate interstate commerce is unlimited, but that in regulating commerce between the state and foreign countries the regulations must be uniform and of one system or plan. The reason is obvious, being so that no discrimination would occur by reason of such legislation.

In the case at bar the regulations sought to be enforced against the complainants apply only to the East Texas and the Oklahoma City oil fields, showing conclusively that they are not intended or meant to be regulations of commerce in a constitutional sense, but merely an attempt upon the part of the federal government to limit the production of oil from these two fields, and to control the man-

ufacture thereof, essentially matters of state regulation.

It may be argued that the purpose of these statutes as set forth in the declarations of emergency, and of policy by Congress, are much broader than the commerce power of Congress, and that these purposes of national rehabilitation are sought to be accomplished through a variety of effort of mutual and voluntary agreement which carry no penalties and also by a variety of more money spending activities of the federal government particularly in the aid of agriculture. .

It is nevertheless true, however, that in those provisions in which the government exhibits the heavy hand of authority to control or to compel a surrender of individual right and individual initiative in the fields of agriculture and of industries with pains and penalties, the statutes themselves in their very terms base the power to enforce upon the Commerce Clause. In this respect the intention of Congress has been made clear.

This conclusion finds support in the legislative history of this act. Senator Wagner of New York, who was largely instrumental in the formulation and drafting of this legislation, said: "I have been discussing codes which are voluntary both as to their competitive practices and as to their labor provisions, and it is primarily upon such spontaneous action that the bill relies. It is not my intention to substitute government for business, or to remove from the shoulders of business men the responsibility for economic recovery. The duties of industrialists are enhanced by the opportunities which the bill offers for constructive cooperation." Again, in the same address, he said: "The question of the proper exercise of Federal authority depends upon whether the bill confines itself to national matters or whether it attempts to extend to matters which are of purely local concern. The answer is clear. The language of the bill expressly provides that any compulsory measures such as the licensing feature of the bill, and any penalties for violation of the codes *shall be confined to business in or affecting interstate commerce. Thus no attempt is made to extend Federal action to an area of activity not covered by the commerce clause of the Constitution."*

Legislative intent is made plain when the statute, after making provision for the codes and providing that said codes shall be the standards of fair competition, says: "Any violation of such standards *in any transaction in or affecting interstate or foreign commerce*

shall be deemed an unfair method," etc. Section 3 (b), 15 USCA § 703 (b).

■ It is a matter of common knowledge that the provisions of the codes do not stop with interstate commerce or with those trades or industries that are interstate in character. There is no pretense of such limitation. To bring such transactions within the constitutional regulatory power of Congress enforceable under penalty of the law, it is necessary to consider that Congress may under the power to regulate interstate and foreign commerce reach back into the states and control without limit the source of production and manufacturing processes, dictate the hours of labor, wages to be paid, the conditions of employment, and the relations of employer and employee.

That such was not the intent of Congress except as it related to interstate transactions in fact is thus made clear.

■ It being made clear from the evidence in this case that complainants have not subscribed to such code and are not engaged in interstate commerce, they are not subject to the pains and penalties provided by the act for violation of such code, because they are clearly not engaged "in any transaction in or affecting interstate or foreign commerce."

To sustain a pretension to powers so vast and so unprecedented and so unheard of should certainly find its basis in the clearest expression of intent upon the part of Congress. Under the plain terms of the act the expression of intent is to the contrary.

■ The power to regulate commerce between the states is without question one of the full, complete, and plenary powers of Congress. As was said by the Supreme Court in the case of Houston, E. & W. Texas R. Co. v. United States, 234 U. S. 342, 34 S. Ct. 833, 836, 58 L. Ed. 1341: "It is unnecessary to repeat what has frequently been said by this court with respect to the complete and paramount character of the power confided to Congress to regulate commerce among the several states. It is of the essence of this power that, where it exists, it dominates. Interstate trade was not left to be destroyed or impeded by the rivalries of local government. The purpose was to make impossible the recurrence of the evils which had overwhelmed the Confederation, and to provide the necessary basis of national unity by insuring 'uniformity of regulation against conflicting and discriminating state legislation.' By virtue of the comprehensive terms of the

grant, the authority of Congress is at all times adequate to meet the varying exigencies that arise, and to protect the national interest by securing the freedom of interstate commercial intercourse from local control. Gibbons v. Ogden, 9 Wheat. 1, 196, 224, 6 L. Ed. 23, 70, 76; Brown v. Maryland, 12 Wheat. 419, 446, 6 L. Ed. 678, 688; County of Mobile v. Kimball, 102 U. S. 691, 696, 697, 26 L. Ed. 238, 240; Smith v. Alabama, 124 U. S. 465, 473, 8 S. Ct. 564, 31 L. Ed. 508, 510; Second Employers' Liability Case, 223 U. S. 1, 47, 53, 54, 32 S. Ct. 169, 56 L. Ed. 327, 345, 347, 348, 38 L. R. A. (N. S.) 44; Minnesota Rate Case, 230 U. S. 352, 398, 399, 33 S. Ct. 729, 57 L. Ed. 1511, 1540, 1541, 48 L. R. A. (N. S.) 1151 [Ann. Cas. 1916A, 18]."

It would neither be instructive nor profitable to undertake to review the numerous cases in which the Supreme Court has upheld the exercise of this power. It may simply be admitted that they go the full length in sustaining legislation by Congress in regulating local conditions or activities which have the effect of directly interfering with interstate commerce so as to be an obstruction or burden thereon.

In Board of Trade v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 477, 67 L. Ed. 839 where the Grain Futures Act was involved, it was held that: "Whatever amounts to more or less constant practice, and threatens to obstruct or unduly to burden the freedom of interstate commerce is within the regulatory power of Congress under the commerce clause, and it is primarily for Congress to consider and decide the fact of the danger and to meet it. This court will certainly not substitute its judgment for that of Congress in such a matter unless the relation of the subject to interstate commerce and its effect upon it are clearly nonexistent."

Here Congress has not declared any local activity or condition as constituting a burden upon interstate commerce. As is held in United States v. Ferger, 250 U. S. 199, 39 S. Ct. 445, 63 L. Ed. 936: It follows that sales for future delivery on the Board of Trade are not in and of themselves interstate commerce. They cannot come within the regulatory power of Congress as such *unless they are regarded by Congress from the evidence before it as directly interfering with interstate commerce so as to be an obstruction or burden thereon.*

As was further said in the Olsen Case: "In the act we are considering, Congress has expressly declared that transactions and prices of grain in dealing in futures are suscepti-

ble to speculation, manipulation, and control which are detrimental to the producer and consumer and persons handling grain in interstate commerce and render regulation imperative for the protection of such commerce and the national public interest therein."

Here there is no such expression of judgment finding or will by Congress. There is not here shown any entry by Congress either directly or through its agency into the exclusive province of the state in dealing with intrastate activities except where those engaged in purely intrastate activities consent to the provisions of the code by subscribing thereto, which is not the case here.

█ There is not perceived in the terms of this act any intention, express or implied, by Congress to invade the sphere of purely local action in aid of or to remove burdens or restrictions upon interstate commerce. In such connection it is interesting to note the observations of the present Chief Justice in an argument before the Federal Oil Conservation Board in 1926, when he was speaking in the capacity as counsel for his client, the American Petroleum Institute, and wherein he quotes the language of the Supreme Court as found in the Coronado Case and the Oliver Mining Company v. Lord, supra, to show that oil production is not commerce and then proceeds as follows: "It may therefore be safely taken for granted that under the powers to regulate commerce Congress has no constitutional authority to control the mere production of petroleum on lands (other than Indian lands) within the territory of a State. All plans for requiring unit operation or otherwise, which involved the assertion of such a power on the part of Congress do not require discussion. They proceed from an utterly erroneous conception of Federal power. It does not further the policy of conservation to take up the public attention with futile proposals which disregard the essential principles of our system of government."

Further, he stated: "I am aware that it has been suggested that such Federal power to control production within the states might be asserted by Congress because it could be deemed to relate to the provision for the common defense and the promotion of the general welfare." The Chief Justice continuing said: "Reference is sometimes made in support of this view to the words of the preamble of the Federal Constitution. But as Story says 'The preamble never can be resorted to to enlarge the powers confided to the general government or any of its depart-

ments. It cannot confer any power per se; it can never amount, by implication, to an enlargement of any power expressly given.'" 1 Story on the Constitution, § 462. And this statement was approved by the Supreme Court of the United States in Jacobson v. Massachusetts, 197 U. S. 11, 22, 25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765.

"The suggestion to which I have referred is an echo of an attempt to construe Article I, Section 8, subdivision 1 of the Constitution of the United States, not as a power 'to lay and collect taxes, duties, imposts, and excises, to pay the debts and provide for the common defense and general welfare of the United States,' but as conferring upon Congress two distinct powers, to wit: (1) the power of taxation and (2) the power to provide for the common defense and the general welfare. In this view, it has been urged that Congress has the authority to exercise any power that it might think necessary or expedient for the common defense or the general welfare of the United States. Of course, under such a construction the government of the United States would at once cease to be one of enumerated powers and the powers of the states would be wholly illusory and would be at any time subject to be controlled in any matter by the dominant Federal will exercised by Congress on the ground that the general welfare might thereby be advanced. That, however, is not the accepted view of the Constitution. (1 Story on the Constitution, secs. 907, 908; 1 Willoughby on the Constitution, sec. 22). The government of the United States is one of enumerated powers and is not at liberty to control the internal affairs of the states respectively such as production within the States, through assertion by Congress of a desire either to provide for the common defense or to promote the general welfare."

The government claims that under a declared emergency powers of Congress are expanded beyond their extent under ordinary circumstances and in ordinary times, and relies upon the cases of Highland v. Russell Car & Snowplow Co., 279 U. S. 253, 49 S. Ct. 314, 73 L. Ed. 688; Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165; Marcus Brown Holding Co. v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. Ed. 877; Wilson v. New, 243 U. S. 332, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024; Chastleton Corp. v. Sinclair, 264 U. S. 545, 44 S. Ct. 405, 68 L. Ed. 841.

In each of the above cases the action complained of was predicated upon an actual existing power of government and the emergency was only the occasion for bringing the power into exercise.

However, as has been very aptly said by the Supreme Court in the recent case of Home Building & Loan Association v. John H. Blaisdell & Wife, 290 U. S. 255, 54 S. Ct. 231, 235, 78 L. Ed. ——:

"Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency. Its grants of power to the federal government and its limitations of the powers of the States were determined in the light of emergency, and they are not altered by emergency. What power was thus granted and what limitations were thus imposed are questions which have always been, and always will be, the subject of close examination under our constitutional system.

"While emergency does not create power, emergency may furnish the occasion for the exercise of power. 'Although an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed.' Wilson v. New, 243 U. S. 332, 348, 37 S. Ct. 298, 302, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024."

By section 9 (c), 15 USCA § 709 (c), the President "is authorized to prohibit the transportation *in interstate and foreign commerce* of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State. Any violation of any order of the President issued under the provisions of this subsection shall be punishable," etc.

By section 10 (a), 15 USCA § 710 (a), "The President is authorized to prescribe such rules and regulations as may be necessary to carry out the purposes of this title."

Indulging as is indicated above, the violent presumption that section 9 (c) is valid in the face of the complaint made against it to the effect that it is an abdication by Congress of its function of legislating and an unconstitutional delegation of authority to the President of its power to legislate, the inquiry arises as to the validity of the regulations made pursuant to this provision. It might be said in passing that there cannot be perceived from this expression of Congress any expression of will or intent of its own,

and that it prescribes no penalty for a violation of the act, but that the penalty prescribed is for violation of any orders that the President might make under the Act and that it further provides that the President may terminate the same at any time he sees fit.

█ Entertaining as I do the gravest misgivings, if not the absolute certainty of conviction, that this provision of the act is invalid by reason of its delegation to the Executive of legislative authority, yet conceding it for the purposes of the decision to be valid, it is obvious that the President and his agents in their rules and regulations could exercise no greater authority nor to any greater extent than that which was exercised by Congress itself. This is limited to the transportation in interstate and foreign commerce of petroleum and the products thereof, etc.

█ It has been repeatedly held that in order to subject one to inquisitions, visitations, and interrogations by extrajudicial bodies for the purpose of obtaining information against them, statutory authority for such claim of right must be shown to plainly and definitely confer upon such bodies such authority. Overton Refining Company v. C. V. Terrell et al., 4 F. Supp. 443, in this court. Counselman v. Hitchcock, 142 U. S. 547, 12 S. Ct. 195, 35 L. Ed. 1110; Interstate Commerce Commission v. Brimson, 154 U. S. 448, 14 S. Ct. 1125, 38 L. Ed. 1047; Harriman v. Interstate Commerce Commission, 211 U. S. 408, 29 S. Ct. 115, 53 L. Ed. 253.

As there is nothing contained in the statute authorizing the action complained of on the part of the respondents, it is clear that such regulations requiring such reports and the going upon the property of the complainants by the respondents, gauging their tanks and digging up their pipe lines are without authority of law.

But the respondents say that the regulations in question are: (1) Reasonably necessary to carry out the purposes of the act, and (2) that they do not infringe upon constitutional rules, but there cannot be read into the act any intention of Congress to invade the rights of the state to regulate matters of purely local concern and regulation such as the production of oil and the refined products thereof where they have no relation to and do not go into interstate commerce, and it is not competent for the Secretary of the Interior, however good his motives, to enlarge by regulation upon the provisions of the act itself.

Since the act in terms only authorizes the prohibition of the transportation in interstate and foreign commerce of petroleum and the products thereof, it certainly cannot be extended to cover by regulation those who are obviously not engaged in the transportation of such products in interstate or foreign commerce or engaged at all in interstate or foreign commerce.

The other provisions of section 9 (c), 15 USCA § 709 (c), relating to transportation in interstate commerce recognize the validity of state regulations and the action of the state regulatory body in fixing the amount of withdrawals and the amount to be produced. This in itself is a denial of any intention upon the part of Congress to grant to national officers the right to act in regard to the production of crude oil or the manufacture of its products.

Such action by officers of the national government is obviously an indirection and evasion contrary to the terms of the act itself in an attempt to regulate and control the production of oil and the manufacture of products therefrom, a matter committed solely to the discretion of the state.

As was said in Stafford v. Wallace, 258 U. S. 496, 42 S. Ct. 397, 403, 66 L. Ed. 735, 23 A. L. R. 229, where the act gave the Secretary of Agriculture a large measure of control over the stockyards of the country and which control extended to practically all the methods of doing business therein, even to the price to be charged for the services rendered in the stockyard; the Supreme Court said: "Whatever amounts to more or less constant practice, and threatens to obstruct or unduly to burden the freedom of interstate commerce is within the regulatory power of Congress under the commerce clause, *and it is primarily for Congress to consider and decide the fact of the danger and meet it.* This court will certainly not substitute its judgment for that of Congress in such a matter unless the relation of the subject to interstate commerce and its effect upon it are clearly nonexistent." Here there has been not only no determination by Congress of a practice that threatens to obstruct or unduly to burden the freedom of interstate commerce except as it relates, if at all, to the transportation in interstate and foreign commerce of petroleum and its products. It has not considered and decided the fact of any other danger to or burden upon interstate commerce and the regulations of the Secretary of the Interior certainly cannot override and en-

large the determinations of Congress by mere regulation to the prejudice of the rights of the state over matters of purely local concern.

The case here is about the same as Stafford v. Wallace if, under the facts of that case, the Secretary of Agriculture had by regulation required that every domestic producer of live stock, engaged solely in intrastate commerce, give him information as to the kind and character, description and age, color and sex of the live stock so raised, something which obviously had no relation to the matter of local practice or condition which Congress was attempting to affect by regulation; then the situation there and here would be fairly comparable. Such a requirement would have had no reasonable relation to the expressed will of Congress and so here. The regulations of the Secretary of the Interior have no reasonable or any relation to the will of Congress expressed in this act. To admit of the authority of the Secretary of the Interior to make such regulations as those involved here is to go in the face of the terms of the act itself. Such an invasion of the rights of the states is not permissible in our dual form of government.

The facts of this case clearly and obviously disclose that the regulations seek by indirection to evade constitutional limitations by superseding state authority to which the power is clearly committed to regulate the local production of crude oil and to supervise the manufacture of products therefrom.

As said in Boyd v. United States, 116 U. S., 616, 6 S. Ct. 524, 535, 29 L. Ed. 746: "Illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure.

This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be "obsta principiis."

As if apropos of the situation here presented, John F. Dillon, addressing himself to the constitutional provisions written for the protection of life, liberty, and property, years ago said: "If there is any problem which can be said to be yet unsettled it is whether the bench of this country, State and Federal, is able to bear the great burden of supporting under all circumstances the fundamental law against popular or supposed popular demands for enactments in conflict with it. It is the loftiest function and the most sacred duty of the judiciary * * * unique in the history of the world * * * to support, maintain and give full effect to the Constitution against every act of the legislature or the Executive in violation of it. This is the great jewel of our liberties. We must not, 'like the base Judean, throw a pearl away richer than all his tribe.' This is the final breakwater against the haste and passions of the people. Against the tumultuous ocean of Democracy. It must at all costs be maintained." Dillon's Laws and Jurisprudence of England and America, p. 214.

The above conclusions obviate the necessity of discussion of the other constitutional questions raised.

A decree may be presented in accordance herewith.