**RYAN et al. v. AMAZON PETROLEUM CORPORATION et al.**

No. 7350.

Circuit Court of Appeals, Fifth Circuit.

May 22, 1934.

Rehearing Denied June 29, 1934.

Chas. I. Francis, Sp. Asst. to Atty. Gen., John F. Davis, of Washington, D. C., S. D. Bennett, U. S. Atty., of Beaumont, Tex., and Douglas Arant, Sp. Asst. to Atty. Gen., for appellants.

W. T. Saye, J. N. Saye, and W. Edward Lee, all of Longview, Tex., and F. W. Fischer, of Tyler, Tex., for appellees.

Before BRYAN, FOSTER, and SIBLEY, Circuit Judges.

SIBLEY, Circuit Judge.

The Amazon Petroleum Corporation, with other producers of petroleum in the East Texas field, brought a bill to enjoin the Railroad Commission of Texas and other officers of the state from enforcing orders of the commission which greatly restricted the production of oil; and at the same time to enjoin Ryan, an agent of the Department of the Interior of the United States, and the United States District Attorney and the Marshal

from enforcing certain portions of the National Industrial Recovery Act (48 Stat. 195) and of the Regulations and Code for the Petroleum Industry promulgated thereunder. A court of three judges having severed the two causes of action and taken jurisdiction of that to enjoin the orders of the Railroad Commission, upheld those orders. Amazon Petroleum Corporation v. Railroad Commission of Texas (D. C.) 5 F. Supp. 633. The cause of action against the federal officers was tried by the District Judge and a final decree rendered by which the defendants were perpetually enjoined from enforcing section 4 of article III of the Petroleum Code and Regulation IV, and from going on the property of the complainants by virtue of them, and from instituting civil actions or criminal prosecutions for violation of them. (D. C.) 5 F. Supp. 639. This decree is now under review by appeal.

Article III of the Petroleum Code is entitled, Production. Section 1 relates to limiting imports of petroleum and its products. Section 2 relates to withdrawals from storage. Section 3 provides for a federal agency designated by the President to make estimates of required domestic production and under approval of the President to allocate it equitably among the states. Section 4 reads: "The subdivision into pool and/or lease and/or well quotas of the production allocated to each State is to be made within the State. Should quotas allocated in conformity with the provisions of this Section and/or Section 3 of Article III of this Code not be made within the State or if the production of petroleum within any State exceeds the quota allocated to said State, the President may regulate the shipment of petroleum or petroleum products in or affecting interstate commerce out of said State to the extent necessary to effectuate the purposes of the National Industrial Recovery Act and/or he may compile such quotas and recommend them to the State Regulatory Body in such State, in which event it is hereby agreed that such quotas shall become operating schedules for that State. If any subdivision into quotas of production allocated to any State shall be made within a State any production by any person, as person is defined in Article I, section 2 of this Code, in excess of any such quota assigned to him shall be deemed an unfair trade practice and in violation of this Code." The attacked Regulation IV was made by the Secretary of the Interior by virtue of the delegation to him of the Presidential power by an Executive Order of July 14, 1933. In substance the Regulation requires every producer of petroleum to file with the Department of the Interior each month a sworn statement of the allowable production fixed by the state agency for each of his properties and wells, the daily production from each and the place of storage, and a declaration that none of the petroleum produced or shipped was in excess of the amount permitted by the state. Regulation VII requires that adequate books and records of all transactions in production and transportation of petroleum be kept and maintained available to inspection by the Department of the Interior. No provision is called to our attention which specifically authorizes the inspection of oil properties and storage tanks. The evidence is without substantial conflict, and shows that the complainants are only producers of crude petroleum, neither selling it for delivery in other states or countries nor transporting it thither, but disposing of it on their properties in Texas. The Texas Railroad Commission has adopted the allocation for the state made under Petroleum Code, article III, section 3, and its orders have reduced the allowable production of complainants' wells to a small percentage of their capacity. The defendants are demanding the reports required by Regulation IV, are inspecting the books and the properties of the complainants and gauging their storage tanks, and threaten and intend to prosecute them for violation of the Regulations and Code. Some of the complainants have in fact been producing and disposing of petroleum in excess of that allowable. The East Texas oil field is the largest in the country and capable alone of producing the petroleum marketable in the United States. It has most of the flowing wells from which oil is most cheaply produced. Production in excess of market demand greatly affects the market price, which has often fallen below the cost of production even in Texas, and sometimes as low as 10 cents per barrel at the well. Eighty-five per cent. of the oil produced in Texas and its products is transported into other states, and greatly affects the oil business in all states. Eighteen other states produce petroleum also, of which California and Oklahoma are capable of producing amounts comparable with those producible in Texas, but in other states the wells are less bountiful and more costly in operation, but yield a very large aggregate production and represent a huge investment. Petroleum is an exhaustible national resource, very necessary in the arts of peace and war, of importance to all parts of the country, and incapable of satisfactory substi-

tution. Its production is a major industry and its distribution is necessarily carried on largely in interstate and foreign commerce since over half of the states produce none. It is peculiar in its transportation and handling, because this is most largely done by means of pipe lines in which the oil of many producers is often indistinguishably mingled on the way to a refinery, to storage tanks, or in transportation to other states and countries. In the oil fields these pipe lines are a complicated and connected system, often underground, with unobservable ramifications. Sometimes by-passes are employed to run oil secretly around the place for its measurement by the mere opening of a valve. By these means and others oil in excess of what is allowable is produced and shipped in interstate commerce in large quantities, not only defeating the attempted restrictions but demoralizing the general markets and often cheating those who have royalty interests in what is produced. If the transportation of excess oil in interstate commerce is to be successfully controlled, the system of reports and records required and the inspections practiced are both reasonable and necessary.

The main contentions made by appellants or by appellees are: (1) That the Secretary of the Interior is an indispensable party to the attack on his Regulations; (2) that the production of oil cannot be regulated by Congress and the provisions of the act and of the Regulations and of the Code dealing with it are unconstitutional; (3) that the Regulations and the Code exceed the authority given by the act; (4) that if Congress could itself have made the attacked provisions, it could not delegate to the President and he could not delegate to others the power to make them; (5) that the reports and inspections are searches and compulsions to self-incrimination forbidden by the Constitution.

■ 1. The Secretary of the Interior is not personally doing or threatening the acts of trespass and of prosecution which are sought to be enjoined. Although the actors may be authorized and incited by him so that he would be a proper codefendant if he were within the court's reach, the court has power to stop the trespassing by those within its jurisdiction irrespective of their claim that they are acting for others. Osborn v. Bank of United States, 9 Wheat. 738, 6 L. Ed. 204; State of Colorado v. Toll, Supt., 268 U. S. 228, 45 S. Ct. 505, 69 L. Ed. 927. This is not a bill to cancel the Secretary's Regulations, but only to test their efficacy to protect defendants in their alleged trespasses against complainants' rights. There is no more need to make the Secretary a party for this purpose than to make the President a party because he promulgated the Code or the Congress because it enacted the statute.

■ 2. The National Industrial Recovery Act, § 303 (40 USCA § 413) provides: "If any provision of this chapter, or the application thereof to any person or circumstances, is held invalid, the remainder of the chapter, and the application of such provision to other persons or circumstances, shall not be affected thereby." We are therefore called on to deal only with those provisions of the act directly involved in this case, and with their application to the circumstances here appearing. A more general discussion of the act is both unnecessary and inappropriate. Section 9 (15 USCA § 709 (c) is devoted to oil regulation. Paragraph (c) reads: "The President is authorized to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State. Any violation of any order of the President issued under the provisions of this subsection shall be punishable by fine of not to exceed $1,000, or imprisonment for not to exceed six months, or both." The prohibition thus authorized was made by the President on July 11, 1933. On its face it is a regulation of transportation in interstate and foreign commerce, and within that familiar power of Congress. But because it is expressly based on and is designed to aid a restriction on production or withdrawal from storage made by valid state law or regulation it is said to be in reality a regulation of production within the state, which is not interstate or foreign commerce. Oil production is either mining or manufacture. Neither the one nor the other is ordinarily within the power of Congress to regulate within a state. Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 32 L. Ed. 346; Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; United Mine Workers v. Coronado Coal Co., 259 U. S. 345, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762; Oliver Iron Mining Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 67 L. Ed. 929; Champlin Refining Co. v. Corporation Commission, 286 U. S. 210, 52 S. Ct. 559, 76 L. Ed. 1062, 86 A. L. R. 403; Utah Power & Light Co. v. Pfost, 286 U. S. 165, 52 S. Ct.

548, 76 L. Ed. 1038. It may be that under peculiar circumstances, such for example as are here shown to exist in the relation of oil production in Texas to commerce in oil with and among the other states, such a burden on or interference with interstate commerce may exist as to justify Congressional action, as in the case of intrastate rates which injuriously affect interstate commerce, Houston E. & W. T. R. R. Co. v. United States, 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341; Wisconsin R. R. Commission v. C., B. & Q. R. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; Florida v. United States, 282 U. S. 194, 51 S. Ct. 119, 75 L. Ed. 291; or local stockyard practices, Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229, or selling of grain on the exchanges. Chicago Board of Trade v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839. Such a question may arise under the provisions of the Petroleum Code, article III, section 4, relating to the fixing of production quotas, but in the provision of the act now before us there is no such question. The regulation of production is assumed to have been validly made by the state, and the federal regulation is actually only of interstate and foreign commerce, adjusted to aid and not to thwart the state action. Such co-operation between state and central government is not constitutionally wrong, but right and desirable. The central government was not created to be an opponent and a rival of the state governments, but to be a supplement and a protection to them. Its enumerated powers, although supreme and sometimes exercised to the dissatisfaction of some state, are not misused when by a happy concord of duty these governments can co-operate. The grant to the central government of the power to regulate interstate and foreign commerce is without qualification and in general exclusive of the states, and that government may rightly take up the regulation of a matter at the point where the state government because of this grant must itself cease to regulate. Thus when some of the states in the exercise of their general police power sought to control the transportation and sale of intoxicating liquors within their borders, Congress with a plain purpose to make the state regulation more effective first made such liquors subject to state laws on arrival, and later forbade them to be transported in interstate commerce into such a state. In re Rahrer, 140 U. S. 545, 11 S. Ct. 865, 35 L. Ed. 572; Clark Distilling Co. v. Western Maryland R. R. Co., 242 U. S. 311, 37 S. Ct.

180, 61 L. Ed. 326, L. R. A. 1917B, 1218, Ann. Cas. 1917B, 845. So the states in the exercise of their police power regulate the stealing of automobiles, but Congress supplementarily forbids and punishes the interstate transportation of stolen cars. Brooks v. United States, 267 U. S. 432, 45 S. Ct. 345, 69 L. Ed. 699, 37 A. L. R. 1407. The Lottery Act supplements in the federal domain a police power indubitably residing in the states. Champion v. Ames, 188 U. S. 321, 23 S. Ct. 321, 47 L. Ed. 492. Other instances might be cited. The provision of the National Industrial Recovery Act under discussion is not unconstitutional because it operates and was intended to operate so as to make more effectual valid state action with reference to oil production.

Nor is it unconstitutional because its effect is temporarily to restrict the volume of interstate and foreign commerce in oil. No doubt in general there should be free trade among the states, but that is not to say that laissez faire must have full scope. The power to regulate interstate commerce is given to Congress in identical terms with the power to regulate foreign commerce. The regulation of foreign commerce for the good of the whole country by severe restrictions on immigration, and by protective tariffs on goods, and by embargoes, is a part of our history and may be independent of any inherent objectionableness in the persons or the articles affected. A similar power, with some special restrictions, exists as to interstate commerce and may be exercised not only to exclude harmful articles but to better the health and stability of such commerce as a whole. Regulation by prohibition was upheld in the cases above cited. What a centralized constitutional government may do in the way of regulation of trade or commerce our dual system can accomplish by the co-operation of its state and central governments.

The contention is also made that the effect of section 9 (c) of the statute is to take property without due process of law. Of course, regulations of commerce, whether by state or central government, must not offend other provisions of their respective Constitutions. But by hypothesis of the statute the regulation by the state must be a valid one. Validity has been adjudicated in this case. The prohibitions on this point of the state Constitution (Const. Tex. art. 1, § 19) and of the Fourteenth Amendment with reference to the state are so similar to the prohibition of the Fifth Amendment as to the central gov-

ernment that if the state regulation be valid, the assisting federal statute cannot well offend at this point.

 3. The act, § 10 (a), 15 USCA § 710 (a), authorizes the President to prescribe such rules and regulations as may be necessary to carry out the purposes of this title, and provides punishment for their breach. Regulations IV and VII providing for monthly statements and for books and records subject to inspection are clearly shown to be necessary in order to render effectual the prohibition of the statute against shipping excess petroleum in interstate and foreign commerce. Excess oil cannot be distinguished after it is mingled with other oil either in the storage tank, the pipe line, or the tank car. If it is produced, it can be traced into interstate commerce only by producers' reports and such inspections as are provided for. The fact that the producers themselves do not engage in interstate commerce does not render it less necessary that they furnish information. Those who buy from them probably could not tell whether what they bought and were about to ship was or was not excess oil. The inspection of books is only a check on the truthfulness of the reports. The attacked regulations are supported as reasonably necessary to the purposes of the act.

 The Code provision, art. III, § 4, adopted under section 3 of the Act (15 USCA § 703) goes further than the provisions of section 9 (c) 15 USCA § 709 (c) heretofore considered because it deals directly with production. These complainants have not consented to the Code and are bound by it only if it has the force of law. The Code provides for an ascertainment by a federal agency of the required domestic production of crude oil and its products, and for its equitable allocation among the several states by Presidential approval; and if the allocation is not regarded by the state agencies by making a subdivision of it among the pools, leases and wells within the state so that an excess production results, the President may either regulate shipments out of the state so as to equalize such shipments or may himself make and recommend to the state agencies such quotas, which shall then become operating schedules for that state. Production by any person in excess of the quota assigned to him is declared an unfair trade practice and in violation of the Code. Since production of excess oil and not its shipment in interstate or foreign commerce thus constitutes violation of the Code, it is said that the commerce power

of Congress is exceeded. In this case the state of Texas has fixed its own quotas, so that federal power to fix them is not involved. We do not inquire whether the production of crude oil intended for shipment in interstate or foreign commerce constitutes such a threat to do that act or such a temptation to it as to be capable of restraint in order to make effectual the prohibition of shipments in such commerce, in the manner in which the possession of intoxicating liquors was held to be regulable by Congress although the sale and transportation only of them was within Congressional power. For by reference to section 3 of the act it appears that the sanctions for violating the Code are but three. Paragraph (b) (15 USCA § 703 (b) declares a violation to be an unfair method of competition within the meaning of the Federal Trade Commission Act (15 USCA §§ 41–51). If that sanction be an unlawful one, and should be sought to be applied against complainants before the Federal Trade Commission, they have their remedy in that proceeding. Paragraph (c) provides for injunction proceedings by the District Attorney to prevent violation, and a complete remedy against wrong is available there. Paragraph (f) provides a sanction by criminal prosecution, but only when the violation is "in any transaction in or affecting interstate or foreign commerce." An indictment or information could not stop at alleging the production of excess oil, but would have to allege with appropriate fullness that it was in a transaction in interstate commerce or affecting it. This sanction is thus tied to and seemingly not intended to exceed the commerce power of Congress. Each such criminal case would depend on its own facts. The provision of the Code thus enforced does not appear to be unconstitutional. Whether any complainant at any time has violated it is more appropriately to be tried in a prosecution of him than in this composite suit in equity. We may say of all three sanctions that an adequate remedy against abuse is afforded in the proceedings indicated by the statute for their respective enforcement, so that a remedy in equity by injunction may not be had.

 4. The delegation to the President of power to put the prohibition of section 9 (c) (15 USCA § 709 (c) into effect is not seriously attacked. Such a thing has been often done under varying forms of language, as appears by the review of statutes in Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294. See, also, Hampton, Jr., & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 72

L. Ed. 624. But the regulations promulgated by the Secretary of the Interior and the Code approved by the President are strongly attacked as an improper delegation of legislative power. We have shown the regulations in question to be reasonable and within the act if made by the President. The act in section 2 (b), 15 USCA § 702 (b) expressly authorized the President to appoint some one else to exercise any function or power given him, and he appointed the Secretary to exercise this function. It is the case of a legislative agent authorized to appoint a subagent. Congress, well knowing that the President could not personally do all that was put on him, authorized him to select some one to attend to the business instead of itself appointing such a one. We know of nothing to forbid it. The regulations made by the Secretary stand as though Congress had directly authorized him to make them.

The Code is a novelty in legislation. Its making was not a delegation by Congress of a power of legislation to the various trade or industrial groups mentioned in section 3.[1] The groups could really do nothing but advise the President, just as Congress itself often is advised by hearing those to be affected. While a very strong influence is accorded to each group, it is the President's act in approving a recommended Code or imposing an involuntary one that gives it force. Congress puts sanctions behind either which are intended to make it enforceable law. Whether the general purposes of the act stated in section 1 (15 USCA § 701) together with the requisites of a Code set out in section 3 (15 USCA § 703) or elsewhere are statements of an intelligible legislative plan sufficient to be filled out and executed by a commission after hearing those to be affected, as for instance when a Legislature orders just and reasonable rates to be established on railroads and authorizes a commission to enquire into and fix them, is a question we need not broadly answer.[2] The particular policy

[1] Congress by the Act of March 2, 1893 (45 USCA § 1 et seq.), enacted that the American Railway Association, a mere trade body, should fix the height of drawbars for railway cars which was to be established as standard by the Interstate Commerce Commission, but there was thereby no unconstitutional delegation of legislative power. St. Louis Iron Mountain & S. R. R. Co. v. Taylor, 210 U. S. 281, 28 S. Ct. 616, 52 L. Ed. 1061. By Rev. St. § 2324 Congress in providing for mining on the public lands enacted that the miners in each district might make regulations not in conflict with law. These regulations come close to being a Miners' Code of fair competition in staking out claims, but there was no improper delegation of legislative powers to the miners. Erhardt v. Boaro, 113 U. S. 537, 5 S. Ct. 565, 28 L. Ed. 1116; Butte City Water Co. v. Baker, 196 U. S. 119, 25 S. Ct. 211, 49 L. Ed. 409.

[2] While Congress cannot abdicate legislative power, it may make large delegations of it, always retaining the right of control and of reassumption. While the Constitution was being written, the then Congress on July 13, 1787, made the Ordinance for the government of the Northwest Territory, in which very broad legislative powers were delegated. Similar delegation occurred when the Louisiana Territory was purchased. Sere v. Pitot, 6 Cranch, at page 337, 3 L. Ed. 240. Legislative power appropriate for a municipality was delegated with reference to the District of Columbia. Stoutenburgh v. Hennick, 129 U. S. 141, 9 S. Ct. 256, 32 L. Ed. 637. Governments with legislative powers have been established by Congress for other territories and insular possessions. See United States v. Heinszen, 206 U. S. at page 385, 27 S. Ct. 742, 51 L. Ed. 1098, 11 Ann. Cas. 688. Broad powers given the Secretary of Agriculture to make regulations touching forest reserves, whose breach was criminally punishable, were upheld in United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563. In all these cases matters within the states were not directly affected. Such matters ought no doubt to be kept more directly in Congressional control; but even so, practical necessity has required of Congress more and more to act through agents in fixing legislative details. The Interstate Commerce Commission is an outstanding example. One of its broadest discretionary powers in reference to the long and short haul clause was upheld as validly delegated in United States v. Atchison, T. & S. F. R. R. Co., 234 U. S. 476, 34 S. Ct. 986, 58 L. Ed. 1408. The Secretary of War is validly empowered to require alteration or removal of bridges which unreasonably obstruct navigable waters. Union Bridge Co. v. United States, 204 U. S. 364, 27 S. Ct. 367, 51 L. Ed. 523; Monongahela Bridge Co. v. United States, 216 U. S. 177, 30 S. Ct. 356, 54 L. Ed. 435. The Federal Reserve Board was validly authorized to empower individual National Banks to act as trust companies. First National Bank of Bay City v. Fellows, 244 U. S. 416, 37 S. Ct. 734, 61 L. Ed. 1233, L. R. A. 1918C, 283, Ann. Cas. 1918D, 1169. The delegation to the President of power

8

and plan disclosed in section 9 (15 USCA § 709) to regulate excess oil by debarring it from interstate commerce is entirely clear. The regulations and Code provisions which are here in issue do not go beyond that purpose and plan.

5. The regulations touching reports and inspection of records are not in violation of the provision of the Fourth Amendment forbidding unreasonable searches or of the Fifth Amendment guaranteeing that no person shall be compelled in any criminal case to be a witness against himself. A producer of oil does not operate under any right or license derived from the federal government and is not subject to such rigorous treatment as if he did. But he is a citizen within the protection of that government and owes it a citizen's duty to assist in the enforcement of its laws. The object of the reports and the inspection of books is to ascertain the existence and the disposition of excess oil in order that its interstate and foreign transportation may be stopped. The government has a right to know about this, just as it has a right to know what the citizen's income is that it may be taxed. Presumably no crime has been committed by producer or taxpayer. No criminal case is pending, and the immediate purpose is information and not prosecution. The fact that the report is required greatly tends to keep producer or taxpayer from committing a crime that would be disclosed thereby. But if he has committed a crime and is entitled to withhold evidence of it, he should at the proper time and on the specific ground that disclosure would tend to criminate him, assert the right to withhold the particular evidence. Because such a thing conceivably might occur is no reason to upset laws and regulations which are generally useful and necessary in the public business.

The inspection of properties and tanks and pipe lines does not seem to be expressly authorized by any regulation. It may be a civil trespass when not consented to, even though it is not a search in the constitutional sense when the premises are open to free entry. See Hester v. United States, 265 U. S. 57, 44 S. Ct. 445, 68 L. Ed. 898; United States v. Western & Atlantic Railroad (D. C.) 297 F. 482. But if a trespass, there is no showing of irreparable damage or insolvency of the trespassers, and no occasion for an injunction on that account.

We are of opinion that the injunction ought not to have been granted, and the decree is reversed and the cause remanded with direction to dismiss the bill.

---

to alter tariffs within limits and for purposes disclosed was held not unconstitutional in Hampton, Jr., & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624. We have discovered no delegation which Congress has plainly made that has been refused recognition by the Supreme Court.