**UNITED STATES v. SCHECHTER et al.**
**Cr. 36041.**

District Court, E. D. New York.
Aug. 28, 1934.

140

Leo J. Hickey, U. S. Atty., of Brooklyn, N. Y., Harold M. Stephens, Asst. Atty. Gen., and Walter L. Rice, Sp. Asst. to Atty. Gen., for the United States.

Joseph Heller, of New York City (Joseph Heller and Jacob R. Heller, both of New York City, of counsel), for defendants.

CAMPBELL, District Judge.

On July 26, 1934, the grand jury of this district returned an indictment against six defendants, Joseph, Martin, Alex, and Aaron Schechter, A. L. A. Schechter Poultry Corporation, and Schechter Live Poultry Market, Inc., charging conspiracy to violate the National Industrial Recovery Act and the Code of Fair Competition for the Live Poultry Industry, for the Metropolitan Area in and about the City of New York, and substantive violations thereof.

The Code of Fair Competition for the Live Poultry Industry for the Metropolitan Area in and about the City of New York was approved by the President of the United States on April 13, 1934, and it became effective on April 23, 1934, and is divided into eight articles.

Article 1 deals with the purposes of the code; article 2 defines certain terms used in the code; article 3 deals with the hours which employees may be engaged in the industry; article 4 deals with the scale of wages to be paid to employees of the industry; article 5 deals with general labor provisions which are to govern the industry; article 6 deals with administrative matters concerning the industry; article 7 provides for certain trade practices which the code prohibits; article 8 deals with general provisions respecting the industry.

The defendants were arrested, pleaded not guilty, and were released on bail, and in pursuance of leave given, they have withdrawn their pleas of not guilty and filed a demurrer to the indictment.

The indictment contains what are alleged as sixty counts.

The defendants are each charged with the violation of the counts, the numbers of which are placed after their names:

Joseph Schechter, counts 1, 27, 28, 37, 39, 40.

Martin Schechter, counts 1–26, both inclusive, 29–36, both inclusive, 38–60, both inclusive.

Alex Schechter, counts 1, 4–23, both inclusive, counts 25, 31–33, both inclusive, 35 and 36, 39–60, both inclusive.

Aaron Schechter, counts 1 and 2, 4–26, both inclusive, 29–33, both inclusive, 35 and 36, 39–60, both inclusive.

A. L. A. Schechter Poultry Corporation, counts 1–26, both inclusive, 29–33, both inclusive, 38–60, both inclusive.

Schechter Live Poultry Market, Inc., counts 1, 27, 28, 39, 40.

The first count charges all of the defendants with conspiracy to commit various offenses against the United States (R. S. § 5440; title 18, U. S. Code, § 88 [18 USCA § 88]) by agreeing and conspiring (a) to sell poultry unfit for human consumption, (b) to sell uninspected poultry, (c) to engage in the practice of "selective killing," (d) to intimidate Code Authority Investigators, (e) to file false and fictitious sales reports, (f) to decline to furnish reports on hours worked by employees, (g) to pay illegal wages, (h) to permit employees to work excessive hours, and (i) to obstruct the Code Supervisor from carrying out his duties.

The remaining fifty-nine counts charge as separate substantive offenses substantially the same violations as those involved in the conspiracy count as follows, the article and section of the code of the industry alleged to be violated being as follows:

Counts 2 and 3 deal with sales of unfit poultry (article 7, section 2); counts 4 to 23 deal with sales of uninspected poultry (article 7, section 22); counts 24 to 33 deal with violations of straight killing (article 7, section 14); counts 34 to 37 deal with threats, coercion, and intimidation (article 7, section 21).

Count 38 deals with false reports (article 6, sections 1 and 2; article 8, section 3).

Count 39 deals with withholding sales reports (article 8, section 3).

Count 40 deals with withholding reports of hours worked (article 3, section 4); counts 41 to 50 deal with illegal wages (article 4, sections 1 and 2); counts 51 to 59 deal with excessive hours (article 3, section 1); count 60 deals with illegal sales to persons not licensed (article 7, section 15).

The demurrer filed by the defendants sets forth eighteen grounds, and following the method pursued by counsel for the government, I will classify them for discussion as follows, placing in parentheses the number of the paragraph of defendants' demurrer being considered:

I. Recovery Act and Code Unconstitutional:

1. Section 3 (f) of the act (15 USCA § 703 (f) violates Fifth Amendment; and national emergency does not warrant depriving persons of constitutional rights (16).

2. Act violates Eighth Amendment by imposing fines (14).

3. Improper delegation of power in violation of section 1, art. 1, of Constitution (15).

4. Improper delegation of power in violation of the Fifth Amendment (17).

II. No Interstate Commerce.

1. Indictment charges no connection with interstate commerce made unlawful; i. e., code is ultra vires the act (1).

2. Conspiracy relates solely to intrastate commerce and defendants are engaged in intrastate commerce (7).

3. No allegation that poultry sold by defendants was moving in interstate commerce (8).

4. Conspiracy relates to state laws rather than federal (12).

III. No Violation of Any Federal Statute:

1. Counts fail to state federal cause of action (3).

2. Elements of offense not charged (4).

IV. Indictment Defective:

1. Too vague and general to be pleaded as res judicata or former jeopardy (2).

2. Too vague and general to prepare defense (5).

3. States conclusions as to conspiracy rather than the facts thereof (6).

4. Object of conspiracy and offense not alleged (10).

5. Vague as to how conspiracy restrained interstate commerce (13).

6. Pleader states conclusions without facts on which they are based (9).

7. Each count is duplicitous (11).

8. Counts 6–23, both inclusive, 34, 35, 36, 37, 39, 41–60, both inclusive, do not allege violations of the code (18).

The National Industrial Recovery Act (Act June 16, 1933, title 15, ch. 15, §§ 701 to 712, inclusive, U. S. C. [15 USCA §§ 701–712]), is based on the Commerce Clause of the Constitution (article 1, § 8, cl. 3), not the Welfare Clause (article 1, § 8, cl. 1), and the first question to be considered is whether the act is a valid exercise of the power of Congress to regulate commerce among the states.

The national powers such as the commerce power are supreme in the field. Rail-

road Commission of Wisconsin v. Chicago, B. & Q. R. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086. Congress in the exercise of its major powers, including the commerce power, has incidental powers tantamount to the police power of a state. Hoke v. United States, 227 U. S. 308, 33 S. Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905; Hamilton v. Kentucky Distilleries Co., 251 U. S. 146, 156, 157, 40 S. Ct. 106, 64 L. Ed. 194. Congress is the sole judge of the necessity of its laws, Farmers' and Mechanics' National Bank v. Dearing, 91 U. S. 33, 23 L. Ed. 196, and the courts have refused uniformly to question the means adopted by Congress to accomplish its purposes, McCulloch v. Maryland, 4 Wheat. 418, 4 L. Ed. 579; Legal Tender Cases, 110 U. S. 421, 441, 4 S. Ct. 122, 28 L. Ed. 204.

Within the limits of the commerce power, Congress is no more restricted by the Fifth Amendment than are state Legislatures by the Fourteenth Amendment. Nebbia v. New York, 291 U. S. 502, 537, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469; Calhoun v. Massie, 253 U. S. 170, 175, 40 S. Ct. 474, 64 L. Ed. 843.

If the Recovery Act is to be declared obnoxious to the Fifth Amendment, it can only be because there is an unreasonable, arbitrary, or capricious regulation, or if its provisions bear no real or substantial relation to the object sought to be attained.

The first section of the National Industrial Recovery Act (15 USCA § 701) provides: "A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist."

This declaration of an emergency contained in the act is not conclusive upon the courts, but is entitled to great respect, Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165, and the national emergency so declared has been noticed by the courts, Appalachian Coals, Inc. v. United States, 288 U. S. 344, 53 S. Ct. 471, 77 L. Ed. 825; United States v. Spotless Dollar Cleaners, Inc. (D. C. S. D. N. Y., March 31, 1934) 6 F. Supp. 725, 729.

An emergency does not create power, but it may furnish the occasion for the exercise of power conferred by the Constitution. Home Building & Loan Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481.

Following the declaration of the emergency is set forth the purposes of the act, and these findings by Congress, incorporated as they are in the body of the act, must be given full recognition. Hill v. Wallace, 259 U. S. 44, 42 S. Ct. 453, 66 L. Ed. 822; Chicago Board of Trade v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839; Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 22 A. L. R. 229; Nebbia v. New York, supra; Block v. Hirsh, supra; United States v. Calistan Packers (D. C.) 4 F. Supp. 660.

Section 3 (f) of the National Industrial Recovery Act (15 USCA § 703 (f), provides: "When a code of fair competition has been approved or prescribed by the President under this chapter, any violation of any provision thereof in any transaction in or affecting interstate or foreign commerce shall be a misdemeanor and upon conviction thereof an offender shall be fined not more than $500 for each offense, and each day such violation continues shall be deemed a separate offense."

Penalty statutes of this character have been upheld as valid. United States v. Clyde S. S. Co. (C. C. A.) 36 F.(2d) 691, certiorari denied, 281 U. S. 744, 50 S. Ct. 350, 74 L. Ed. 1157.

Penalties for recurrent violations do not make fines excessive. Badders v. United States, 240 U. S. 391, 36 S. Ct. 367, 60 L. Ed. 706; Gulf, Colorado, etc., Ry. v. Texas, 246 U. S. 58, 38 S. Ct. 236, 62 L. Ed. 574.

I do not overlook the fact that a statute may be obnoxious which imposes penalties so great, or conditions so onerous, that no one will dare test its constitutionality, for fear that his opinion may be wrong and the severe penalty be inflicted. Ex parte Young, 209 U. S. 123, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764; but that is not the situation here.

See Waters-Pierce Oil Co. v. Texas, 212 U. S. 86, 29 S. Ct. 220, 53 L. Ed. 417, in which the Supreme Court held that, in view of the fact that the defendant's assets were valued at more than $40,000,000, penalties of $1,623,500 imposed by a Texas court were not excessive, even though most of the penalties imposed accumulated at the rate of $1,500 per day.

This point seems to be raised prematurely if defendants merely fear that the aggregate sentence that may be imposed may be excessive. Wadley Southern R. v. Georgia, 235 U. S. 651, 662, 35 S. Ct. 214, 59 L. Ed. 405.

■ The provision for a $500 fine for each offense does not violate the Fifth and Eighth Amendments.

The only delegation of powers involved in this case is the President's approval of the code, and we are not concerned with any delegation of powers which include orders, regulations, and rules suggested by the defendants.

The first section of the act (15 USCA § 701) declares the policy of Congress to be: "To remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources."

Section 3 (a) of the act (15 USCA § 703 (a) provides: "Upon the application to the President by one or more trade or industrial associations or groups, the President may approve a code or codes of fair competition for the trade or industry."

Section 3 (b) of the act (15 USCA § 703 (b) provides that such approved codes shall be "the standards of fair competition for such trade or industry."

The Code of Fair Competition here alleged to be violated was approved by the President April 13, 1934, after joint hearings conducted by the Agricultural Adjustment Administration and the Industrial Recovery Administration.

This brings us to the real question at issue, whether Congress by the provisions of section 1 of the act, supra, has set up adequate standards to warrant the delegation of power involved in the President's act in approving the code. J. W. Hampton & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624.

Article 1, § 1, of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

■ Congress may, without improperly delegating legislative power, set up a general standard and delegate to administrative bodies the power to make such standard effective. Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 500, 36 L. Ed. 294; Buttfield v. Stranahan, 192 U. S. 470, 24 S. Ct. 349, 48 L. Ed. 525; Union Bridge Co. v. United States, 204 U. S. 364, 27 S. Ct. 367, 51 L. Ed. 523; United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563.

The courts have frequently recognized the necessity of delegating substantial powers to carry out the legislative intent.

In Hampton & Co. v. United States, supra, a delegation of power to the President to reclassify tariff duties established by the Tariff Act of 1922 (42 Stat. 858), after investigating the difference between foreign and domestic costs of production, and other competitive factors, was sustained.

In Field v. Clark, supra, there was sustained the delegation of power to the President to suspend the free importation of certain commodities which he might "deem to be reciprocally unequal and unreasonable" where foreign countries were imposing duties on American products.

In Buttfield v. Stranahan, supra, the Tea Inspection Act of 1897 (29 Stat. 604), authorizing the Secretary of the Treasury to establish standards of purity for imported tea, and to exclude all teas not measuring up to such standards, was sustained.

In United States v. Grimaud, supra, there was sustained the power given to the Secretary of Agriculture, in a forestry conservation statute, to regulate the occupancy of, and use of, a reservation, and to preserve the forest thereon from destruction, and punishment was provided for violation thereof.

In Norwegian Nitrogen Co. v. United States, 288 U. S. 294, 53 S. Ct. 350, 77 L. Ed. 796, there were approved the flexible provisions of the Tariff Act of 1922.

In Inter-Mountain Rate Cases, 234 U. S. 476, 34 S. Ct. 986, 58 L. Ed. 1408, a delegation of broad discretionary powers in reference to the long and short haul clause was upheld.

In Avent v. United States, 266 U. S. 127, 45 S. Ct. 34, 69 L. Ed. 202, there was approved the power delegated to the Interstate Commerce Commission to grant certain preferences.

In Union Bridge Co. v. United States, 204 U. S. 364, 27 S. Ct. 367, 51 L. Ed. 523; President, etc., of Monongahela Bridge Co. v. United States, 216 U. S. 177, 30 S. Ct. 356, 54 L. Ed. 435, the delegation of power to the Secretary of War to require alteration or removal of bridges which unreasonably obstruct navigable water was sustained.

In Ryan v. Amazon Petroleum Corporation, 71 F.(2d) 1, 7 (C. C. A. 5) May 29, 1934, there was sustained the broad power vested in the President under section 9 (c) of the National Industrial Recovery Act (15 USCA § 709 (c), to prohibit transportation of excess oil, and the redelegation of that power to the Secretary of the Interior, in accordance with section 2 (a) of the act.

No redelegation of power is involved in this case.

In United States v. Calistan Packers, supra, the District Court for the Northern District of California upheld the delegation of power by the Agricultural Adjustment Act (7 USCA §§ 601–619) to the Secretary of Agriculture, to issue licenses to persons engaged in handling agricultural commodities, and providing for revocation and fines of $1,000 per day for violation thereof.

Not only would it be impracticable, but virtually impossible, for Congress to perform the duties which it delegated to the President and his agents. The investigations, hearings, negotiations, enactment of codes and code amendments for the very large number of industries, operating under dissimilar conditions and requiring different treatment, require immediate attention, and to require Congress to assume those duties would seriously interfere with, if it did not deprive it of, its power to effectively regulate commerce.

I am not unmindful of, nor have I overlooked, the cases cited on behalf of the defendants, to which I make no reference.

 It is beyond dispute that Congress cannot delegate legislative power to the President; therefore it is unnecessary to discuss the cases cited by defendants in support of that contention. Field v. Clark, supra, and Hampton v. United States, supra, cited by defendants on the question of delegation of power, have been considered by me and cited in support of my opinion.

United States v. Bob Lieto, 6 F. Supp. 32, 36, United States District Court, Northern District of Texas, February 16, 1934, cited by the defendants, from the observation quoted, "The only controversy that is here is between the humble citizen who asserts his right to carry on his little business in a purely local commodity, and in a purely local fashion, without being arrested and punished for a mythical, indirect effect upon interstate commerce," shows that the facts in that case are clearly distinguishable from those in the case at bar.

The citation by defendants of an opinion by United States District Judge Dawson, of Louisville, Ky. (May 18, 1934), without stating the name of the case or where reported, makes it impossible for this court to do more than say that from the quotations in defendants' brief, that opinion was based largely upon the General Welfare Clause of the Constitution, which is not in issue here.

In United States v. Suburban Motor Service Corporation (D. C.) 5 F. Supp. 798, the National Industrial Recovery Act was not declared unconstitutional. At page 802 of 5 F. Supp., Judge Barnes says: "But, while the principle that legislative power may not by Congress be delegated to other agencies of government has been frequently announced, yet decisions which have held acts of Congress invalid because of violation of the principle are difficult or impossible to find. Accordingly, this court, being one of the inferior courts contemplated by the Constitution, does not feel justified in declaring the act in question invalid because of the violation of the principle of constitutional law prohibiting the delegation of legislative power."

In Amazon Petroleum Corporation v. Railroad Commission (D. C.) 5 F. Supp. 639, at page 649, cited by defendants, Judge Bryant said: "Entertaining as I do the gravest misgivings, if not the absolute certainty of conviction, that this provision of the act is invalid by reason of its delegation to the Executive of legislative authority, yet conceding it for the purposes of the decision to be valid, it is obvious that the President and his agents in their rules and regulations could exercise no greater authority nor to any greater extent than that which was exercised by Congress itself."

It is to be observed that in that case the act was not decided to be unconstitutional.

In United States of America v. Spotless Dollar Cleaners, Inc., supra, Judge Knox said: "To the end that these purposes might be accomplished, the President was vested with broad and comprehensive powers. With the right of Congress to make such delegation, there can be, in my opinion, no reasonable dispute."

These are all of the decisions on the law in question brought to my attention, or that I have found, and I am in agreement with Judge Knox of this Circuit.

■ The defendants' argument, based on the use of the word "code" in the Recovery Act, does not seem to me to be determinative. It is the substance of the power granted, not the name given to it, that is of moment, and the question of the right of Congress to grant the power to the President has been fully discussed.

■ Defendants' contention that codes must be uniform throughout the country strikes at the root of the regulation proposed.

It seems to me that uniformity between members of the same class is sufficient, and that is attained.

The only questions before this court are questions of law.

■ The emergency existed. The selection of the remedy and the method of enforcement rested with Congress, which has spoken, and I am convinced that the congressional policy and standards are sufficiently set forth in the Recovery Act; and that the power delegated to the President by said act, by section 3 (a) was properly delegated under the Constitution.

■ The National Industrial Recovery Act is an emergency measure, for a fixed period (section 2 (c) of the act, 15 USCA § 702 (c), and as such does not violate the Constitution.

■ Without repeating here the allegations of the indictment, it seems to me that interstate commerce in live poultry is fully described in paragraphs 2, 3, 4, and 5 of the indictment, which are in count 1, and by reference are incorporated in all other counts. Counts 4 and 5 and what are denominated as counts 6 to 23, both inclusive, deal with poultry trucked into New York from Pennsylvania by the defendants, and immediately sold by them. In them it is alleged that the defendants are themselves engaged in interstate commerce, and that the transaction of sale at their wholesale slaughterhouses, in Brooklyn, N. Y., occurred while the poultry were still moving in interstate commerce. This contention that such first sales within the state are in interstate commerce is indicated by the decision in Greater New York Live Poultry Chamber of Commerce et al. v. United States (C. C. A.) 47 F.(2d) 156. In that case the Circuit Court of Appeals of this Circuit, upon the assumption that the commission men were purchasers, rather than agents of the western shippers, held that the sales by them to the wholesale slaughterhouses were sales in interstate commerce. When, as in this case, it is alleged that the defendants themselves trucked the poultry into the state of New York, instead of purchasing it from New York commission men, it seems to me that the first sale is analogous to the commission men's sale in Greater New York Live Poultry Chamber of Commerce et al. v. United States, supra. See, also, People's Gas Co. v. Public Service Commission, 270 U. S. 550, 46 S. Ct. 371, 70 L. Ed. 726; Binderup v. Pathé Exchange, Inc., 263 U. S. 291, 44 S. Ct. 96, 68 L. Ed. 308; Swift & Co. v. United States, 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518.

As to the remaining thirty-nine substantive counts, it is not alleged that the violations and transactions in which they occurred were in interstate commerce, but that the transactions in which they occurred affect interstate commerce.

The poultry to which these counts relate was purchased by the defendants from the New York commission men. The interstate movement of the poultry ceased prior to the sale by the defendant wholesalers.

In each count the allegation as to the general interstate commerce in live poultry and the effect of the violations upon commerce are sufficiently alleged.

■ Counts 41–50, both inclusive, relating to payment of illegal wages, and counts 51–59, both inclusive, relating to excessive hours, all contain allegations that such violations enable defendants to obtain unfair advantages over competing wholesalers, encourage and cause other wholesalers to engage in the same practice, and all other practices prohibited by the code, and thereby obstruct and prevent the accomplishment of the purposes of the code and the Recovery Act, cause a disruption in the normal flow of interstate commerce in live poultry, and divert interstate shipments thereof.

■ Counts 34–37, both inclusive, relating to coercion and intimidation, count 38, relating to false reports, and counts 39–40, both inclusive, relating to withholding reports, are alleged to obstruct the enforcement and defeat the purposes of the code, and thereby cause competitive evils disrupting the normal and orderly flow of interstate commerce in poultry. The allegations in each of these counts as to the disruption of the normal and orderly flow of interstate commerce in poultry are sufficient.

Counts 24-35, both inclusive, relating to the straight killing provision of the code, are alleged to defeat the purposes of the code, cause interstate shipments of ungraded poultry, demoralize the price structure, and diminish shippers' returns. The allegations in each of these counts are sufficient.

Counts 4 and 5, and the portion denominated as count sixth to count twenty-third, both inclusive, relate to the sale of uninspected poultry. The allegations as to the effect on interstate commerce of selling uninspected poultry seem to me to be much more direct.

Count 60, relating to sales to persons not licensed, contain sufficient allegations as to the effect on interstate commerce.

Counts 2 and 3, relating to the sale of poultry unfit for human consumption, as alleged, present cases in which the effect upon interstate commerce is very direct.

That proof of some allegations in some counts may be difficult furnishes no reason for rejecting the counts, as all questions relating to the proof are to be determined on the trial.

The first count alleging conspiracy is alleged with great detail and is sufficient to charge the crime.

In an indictment for conspiracy it is not necessary to charge the object of the conspiracy with the same particularity as in a charge of the substantive offense.

Section 3 (f) of the National Industrial Recovery Act provides as follows: "When a code of fair competition has been approved or prescribed by the President under this chapter, any violation of any provision thereof in any transaction in or affecting interstate or foreign commerce shall be a misdemeanor and upon conviction thereof an offender shall be fined not more than $500 for each offense, and each day such violation continues shall be deemed a separate offense."

By the use of the words "or affecting interstate * * * commerce," it is apparent that Congress intended to assume all of the jurisdiction that it had under the Commerce Clause of the Constitution.

The indictment sufficiently alleges interstate commerce and the effect of violations on such Commerce Clause, as required by the act.

It is immaterial whether or not the poultry was moving in interstate commerce at the time of the violations, if Congress had constitutional power to prohibit conduct "affecting" interstate commerce in the manner alleged in the indictment.

By article 1, § 8, of the Constitution, there is conferred upon Congress the power "To regulate Commerce with foreign Nations, and among the several States" (clause 3), and "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof" (clause 18).

Although the federal government is one of the enumerated powers, its enumerated powers are supreme and paramount to the reservation of state powers. Ryan v. Amazon Petroleum Corporation, supra; Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23; Houston, E. & W. Texas Ry. v. United States, 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341; Wisconsin R. R. Com. v. C., B. & Q. R. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; Colorado v. United States, 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 878; United States v. N. Y. Central R. R., 272 U. S. 457, 47 S. Ct. 130, 71 L. Ed. 350; Alabama v. United States, 279 U. S. 229, 49 S. Ct. 266, 73 L. Ed. 675; Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

Under the Commerce Clause, Congress may regulate local transactions burdening or inextricably intermingled with interstate commerce. Local 167 v. United States, 291 U. S. 293, 54 S. Ct. 396, 78 L. Ed. 804; Swift & Co. v. United States, supra; Stafford v. Wallace, supra; United States v. Ferger, 250 U. S. 199, 39 S. Ct. 445, 63 L. Ed. 936.

Congress may regulate intrastate commerce if necessary to make effective its regulation of interstate commerce. Wisconsin R. R. Com. v. C., B. & Q. R. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; Minnesota Rate Cases, supra; United States v. N. Y. Cent. R. R., 272 U. S. 457, 47 S. Ct. 130, 71 L. Ed. 350; Alabama v. United States, supra.

Congress has never before legislated as to general trade practices merely "affecting" interstate commerce.

That, however, does not show that it does not have the power.

As I have before said, the Recovery Act is an emergency measure and represents a change in social theory.

That theory applied by the Sherman Anti-Trust Act (15 USCA §§ 1–7, 15 note) was that competition would best preserve a free and orderly flow of interstate commerce, while by the Industrial Recovery Act that social theory has been modified by the provision of a system of supervised regulation of trade practices affecting interstate commerce.

With the choice of means we have no concern; that rests with Congress, and it well may be that in the emergency things which were of small importance in normal times have now become of considerable importance, requiring a wider exercise of power.

The only question now to be considered is whether Congress had constitutional power to prohibit conduct "affecting" interstate commerce.

In Gibbons v. Ogden, supra, which was the first case in which the Commerce Clause was considered, Chief Justice Marshall, at page 196 of 9 Wheat., said: "It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." And at pages 194 and 195 of 9 Wheat., he said:

"It is not intended to say, that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other states. * * *

"The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation and to those internal concerns which affect the states generally; but not to those which are completely within a particular state, which do not affect other states, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government."

The Sherman Anti-Trust Act prohibits conspiracies in restraint of trade or commerce, and has been interpreted as applying only to conspiracies unreasonably or substantially restraining interstate commerce. Standard Oil Co. v. United States, 221 U. S. 1, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; United States v. American Tobacco Co., 221 U. S. 106, 31 S. Ct. 632, 55 L. Ed. 663.

■ In the Recovery Act the intent of Congress was to extend criminal jurisdiction so as to reach all cases where violations of approved codes affect interstate commerce, whether or not they substantially or unreasonably restrain such commerce.

Of course, the violations must substantially affect interstate commerce and not be merely incidental.

Notwithstanding the difference between the Sherman Anti-Trust Act and the Recovery Act, the following cases under the former act seem to me to show the constitutional power of Congress to regulate conduct affecting interstate commerce:

In Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229, the validity of the Packers and Stockyards Act (7 USCA § 181 et seq.) which empowered the Secretary of Agriculture to regulate stockyards so as to prevent unfair practices and monopoly, to fix commission charges, to require reports, to make regulations for feeding, etc., was sustained. The court, by Mr. Chief Justice Taft, said, at page 521 of 258 U. S., 42 S. Ct. 397, 403: "Whatever amounts to more or less constant practice, and threatens to obstruct or unduly to burden the freedom of interstate commerce is within the regulatory power of Congress under the commerce clause, and it is primarily for Congress to consider and decide the fact of the danger and meet it."

In Northern Securities Co. v. United States, 193 U. S. 197, 24 S. Ct. 436, 48 L. Ed. 679, it was held that the Sherman Anti-Trust Act, in prohibiting the acquisition by a holding company of the stock of two competing interstate railroads, was constitutional, and rejected the contention that Congress could not forbid individuals from disposing of their corporate stock or other property.

In Bedford Co. v. Stone Cutters' Ass'n, 274 U. S. 37, 47 S. Ct. 522, 71 L. Ed. 916, 54 A. L. R. 791, a combination on the part of members of a national labor union, to refuse to install stone quarried by nonunion shops in Indiana, was held to be conspiracy in restraint of interstate commerce, and Mr. Justice Sutherland, at pages 46 and 47 of 274 U. S., 47 S. Ct. 522, 524, said: "That the means adopted to bring about the contemplated restraint of commerce operated after physical transportation had ended is immaterial. (Citing cases.) The product against which the strikes were directed, it is true, had come to rest in the respective localities to which it had been shipped, so that it had ceased to be a subject of interstate commerce. * * * In other words, strikes against the local use

of the product were simply the means adopted to effect the unlawful restraint."

In Board of Trade of Chicago v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839, the Grain Futures Act (7 USCA § 1 et seq.) under which Congress undertook to regulate futures contracts on grain exchanges, was held constitutional, notwithstanding the fact that the making of grain futures contracts were local, and it appeared that most of such contracts were settled by offsetting contracts rather than by actual delivery of grain. At page 40 of 262 U. S., 43 S. Ct. 470, 478, the court, by Mr. Chief Justice Taft, said: "Sales of an article which affect the country-wide price of the article directly affect the country-wide commerce in it. By reason and authority, therefore, in determining the validity of this act, we are prevented from questioning the conclusion of Congress that manipulation of the market for futures on the Chicago Board of Trade may, and from time to time does, directly burden and obstruct commerce between the states in grain, and that it recurs and is a constantly possible danger. For this reason, Congress has the power to provide the appropriate means adopted in this act by which this abuse may be restrained and avoided."

In United States v. Patten, 226 U. S. 525, 33 S. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325, an indictment under the Sherman Anti-Trust Act, charging defendants with a conspiracy to corner the cotton market by purchasing all available cotton futures contracts, was upheld.

In Lemke v. Farmers' Grain Co., 258 U. S. 50, 42 S. Ct. 244, 66 L. Ed. 458, a North Dakota statute requiring grain buyers to obtain state licenses and to submit to a system of grading and inspection was held to be an unconstitutional encroachment upon the federal commerce power, because most of the grain so purchased by local buyers was regularly shipped into other states.

In Thornton v. United States, 271 U. S. 414, 46 S. Ct. 585, 70 L. Ed. 1013, the Animal Industry Act (23 Stat. 31), which provided for quarantining and disinfecting cattle in the various states, for the purpose of preventing the spread of animal diseases from one state to another, was upheld.

In United States v. Ferger, 250 U. S. 199, 203, 39 S. Ct. 445, 446, 63 L. Ed. 936, an act of Congress making it a federal offense to issue forged or fictitious interstate bills of lading was upheld, and the court, by Mr. Chief Justice White, said: "Thus both in the pleadings and in the contention as summarized by the court below it is insisted that, as there was and could be no commerce in a fraudulent and fictitious bill of lading, therefore the power of Congress to regulate commerce could not embrace such pretended bill. But this mistakenly assumes that the power of Congress is to be necessarily tested by the intrinsic existence of commerce in the particular subject dealt with, instead of by the relation of that subject to commerce and its effect upon it. We say mistakenly assumes, because we think it clear that if the proposition were sustained it would destroy the power of Congress to regulate, as obviously that power, if it is to exist, must include the authority to deal with obstructions to interstate commerce (In re Debs, 158 U. S. 564, 15 S. Ct. 900, 39 L. Ed. 1092) and with a host of other acts which, because of their relation to and influence upon interstate commerce, come within the power of Congress to regulate, although they are not interstate commerce in and of themselves."

In Railroad Commission of Wisconsin v. Chicago, B. & Q. Railroad Co., supra, Congress upheld an order of the Interstate Commerce Commission directing railroads in Wisconsin to increase their interstate rates, in order that the railroads would receive a reasonable return from their intrastate traffic, in conformity with the purposes of the Transportation Act of 1920 (41 Stat. 456).

In Colorado v. United States, supra, an order of the Interstate Commerce Commission requiring a railroad to abandon a part of its intrastate railroad lying wholly within one state, over the objection of the state, was sustained.

See, also, Transit Commission v. United States, 289 U. S. 121, 53 S. Ct. 536, 77 L. Ed. 1075.

In Minnesota Rate Cases, supra, the scope of the interstate power of Congress is described.

In Northern Securities Co. v. United States, 193 U. S. 197, 337, 24 S. Ct. 436, 48 L. Ed. 679, the congressional policy behind the Sherman Anti-Trust Act is described, and the action of Congress sustained.

In Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, the Child Labor Law (39 Stat. 675) was held unconstitutional, but there was no showing in that case that the practice sought to be regulated had any effect upon interstate commerce.

Whether Congress may or may not have chosen the best method of dealing with the

problems within its province is not a subject for consideration by this court; it is sufficient if the method be reasonable and not palpably arbitrary or capricious.

█ If acts of Congress have a reasonable relation to proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied. Nebbia v. New York, 291 U. S. 502, 537, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469.

█ The Recovery Act, in dealing with transactions affecting interstate commerce, of course deals with violations which substantially affect interstate commerce, and not with violations which are merely incidental and as so construed is constitutional.

The allegations of the indictment in the case at bar show substantial violations, not merely incidental violations, which affect interstate commerce, in poultry, an article of food, by those who dealt in no small way, but in thousands of pounds thereof.

█ Defendants urge that the act does not provide for punishment for violation of the act itself, but of the codes approved by the President, and therefore the indictment does not adequately charge the violation of any federal statutes.

This it seems to me is too narrow a view to take, because by the Recovery Act Congress made disobedience of such a code a misdemeanor, and imposed a penalty; therefore to commit such a misdemeanor is to violate the Recovery Act, which is a federal statute.

As to the various grounds stated in the demurrer on which it is contended that the indictment is defective, it will be better to consider the counts generally with reference to all of such grounds.

The first count is for conspiracy. The object to be accomplished is stated, and that object is the commission of certain described acts, which are made misdemeanors by the Recovery Act, and are therefore offenses against the United States. The plan or scheme is alleged, and there is also alleged the business relations of the defendants, which formed the means for accomplishing the object, and finally the agreement or understanding.

There are also alleged a large number of overt acts.

The charge of conspiracy cannot be aided by the statement of the overt acts, nor is there any necessity therefor in this case, as the charge is sufficiently made in this case.

In an indictment for conspiracy, the rules of criminal pleading do not require the same degree of detail in stating the object of the conspiracy, as if it was one charging the substantive crime. Thornton v. United States, 271 U. S. 414, 423, 46 S. Ct. 585, 70 L. Ed. 1013; Williamson v. United States, 207 U. S. 425, 447, 28 S. Ct. 163, 52 L. Ed. 278.

█ The form of the indictment for conspiracy used in the case at bar is sufficient. Joplin Mercantile Co. v. United States, 236 U. S. 531, 534, 35 S. Ct. 291, 59 L. Ed. 705; United States v. Seidman (D. C.) 45 F.(2d) 178.

█ The first count is not duplicitous or otherwise objectionable, because it alleges a conspiracy to commit more than one offense, under different sections of a statute. The conspiracy is a single crime, even though it be to commit a number of offenses. Frohwerk v. United States, 249 U. S. 204, 209, 39 S. Ct. 249, 63 L. Ed. 561; Knoell v. United States (C. C. A.) 239 F. 16, 20, certiorari denied, 246 U. S. 648, 38 S. Ct. 316, 62 L. Ed. 920; United States v. Eisenminger (D. C.) 16 F. (2d) 816.

█ A defendant may be charged with conspiracy, in one count, to commit offenses under different statutes. Ford v. United States, 273 U. S. 593, 602, 47 S. Ct. 531, 71 L. Ed. 793; Anderson v. United States (C. C. A.) 273 F. 20, 28, certiorari denied, 257 U. S. 647, 42 S. Ct. 56, 66 L. Ed. 415.

█ Counts 2 and 3 defendants contend are defective and charge no crime, in that defendants are charged with selling an unfit chicken, and not with selling a chicken unfit for human consumption.

Defendants are in error and must have overlooked paragraph 7 of the indictment. This paragraph was by reference incorporated in counts 2 and 3, and provides: "Culls and poultry unfit for human consumption hereinafter will be collectively called unfit poultry or unfit chickens; and other poultry will be called healthy poultry or healthy chickens." Therefore by the words "unfit chickens" there was described a chicken unfit for human consumption.

Defendants contend that counts 4 to 23, inclusive, are defective and charge no crime, in that it is alleged that chickens were sold or purchased without having the same inspected or approved in accordance with any rule, regulation, or ordinance of the city of New York.

There is no allegation in the indictment that there is such a rule, regulation, or ordinance.

This objection is good unless this court will take judicial notice of the ordinances of the city of New York.

Of course, this court will take judicial notice of regulations of federal departments, and of the laws and judicial decisions of the several states of the Union. Gerling and Martin v. Baltimore & Ohio Railroad, 151 U. S. 673, 14 S. Ct. 533, 38 L. Ed. 311; Lamar v. Micou, 114 U. S. 218, 223, 5 S. Ct. 857, 29 L. Ed. 94; Hanley v. Donoghue, 116 U. S. 1, 6, 6 S. Ct. 242, 29 L. Ed. 535; Kaye v. May (C. C. A.) 296 F. 450, 453.

The Greater New York Charter is a statute of the state of New York, and section 1172 of that Charter provided that the New York Sanitary Code shall be a part of the New York City Ordinances, and the New York Sanitary Code requires inspection of all poultry brought into the city of New York.

The New York state courts take judicial notice of an ordinance enacted pursuant to a statute which provides for it, and the court, through its notice of the statute, will judicially notice that which the statute contemplates. Beman v. Tugnot, 7 Super. (5 Sandf.) 153; Schrumpf v. People, 14 Hun, 10, 12.

An amendment to the Greater New York Charter (section 1556, as amended by Laws 1917, c. 382), enacted as a state law May 5, 1917, removed any doubt there might be as to whether state courts should take judicial notice of city ordinances. It provides: "All courts in the city shall take judicial notice of city ordinances."

The state courts have held, under this provision, that the New York Supreme Court, the highest court of original jurisdiction in the state, sitting in New York City, will take judicial notice of city ordinances. Greenberg v. Schlanger, 229 N. Y. 120, 122, 127 N. E. 896; Wirth v. Burns, 229 N. Y. 148, 150, 128 N. E. 111; People v. Waldron, 183 App. Div. 807, 170 N. Y. S. 773, 776; Cohen v. A. Goodman & Sons, 189 App. Div. 209, 178 N. Y. S. 528, 530.

That objection is not sustained.

With reference to counts 24 to 36, defendants contend that they are defective and charge no crimes, in that said counts charge a violation of article 7, section 14 (violation of straight killing), and that it is not stated in the indictment that the selections were not made for the purpose of determining whether or not said chickens were culls or diseased, and that the indictment is further defective in that said article and section do not make it a crime to reject individually healthy chickens; that the requirements of straight killing are unreasonable, and that a merchant cannot force a purchaser to buy chickens of the seller's choice.

A violation of the article and section is made a misdemeanor by the Recovery Act. The allegations are that the chickens selected were sold, and certainly that negatives the selection for the purpose of determining whether they were culls or diseased, and the allegation as to rejection shows that the sale was made in other than straight killing.

In view of the allegations as to the effect on interstate commerce, of other than straight killing, I cannot, as a matter of law, determine the requirements of straight killing to be unreasonable. In passing, let me say that the code does not deal with the purchaser, but with the seller.

Assuming as I must on this demurrer the truth of the allegations, the objection is not sustained.

Counts 34 to 37, inclusive, sufficiently allege a violation of anti-racketeering under subdivision 1 of section 21, article 7. They allege what was done by defendants, the name of the person to whom the acts were directed, the place where, and the date when.

The defendants are in error. The article is not limited to acts done to members, but to acts done by members of the industry, and their objection is not sustained.

As to count 38, the indictment does state in what respects the reports were false, and certainly does state that they related to the sale of poultry. Article 8, section 3, does call for the making of the report. The making of a false report is not a compliance with the requirement, but a violation of a provision of the code, under section 3 of the National Industrial Recovery Act (15 USCA § 703).

The objection is not sustained.

The objection to count 39 is without merit, as paragraph 8 of the indictment, which is incorporated by reference, alleges that the defendants, during a time much longer, but during the time in question, have been engaged in maintaining, operating, and conducting, on their own behalf, and on behalf of each other, wholesale slaughterhouse business at 991 Rockaway avenue, Brooklyn, N.

Y., and at 858 East Fifty-Second street, Brooklyn, N. Y.

The failure to make a report was a violation of the code provision.

The objection is not sustained.

The objection to count 40 is sustained.

■ There is no allegation in that count that any employees of the defendants worked during legal holidays or Jewish holidays, or on emergency maintenance or repair work during the period alleged in the indictment, and the only report required by article 4, section 3, is of employees who worked during legal holidays or Jewish holidays, or on emergency, maintenance, or repair work.

■ The objection to counts 41 to 50, inclusive, that there is no allegation that the payment of less than 50 cents an hour was in any pay period is met by the allegations that the pay of less than 50 cents an hour to the person mentioned was for each hour worked by the employee.

The allegation that the person was employed by them in the wholesale slaughterhouse operated by them is sufficient to show he was engaged in the industry. The objection is not sustained.

■ The objection to counts 51 to 59, inclusive, that they do not charge a crime, in that they do not charge that the employee was engaged in the industry, is met by the allegation that the person was employed by them in the wholesale slaughterhouse operated by them, which is sufficient to show that he was engaged in the industry. The objection is not sustained.

■ The objection to count 60, which has to do with a sale of live poultry to a person not licensed, is not sustained. This is a violation of the code, and that is all we are concerned with. By that count there is no attempt made to punish any one for a failure to obey state laws or municipal ordinances requiring him to obtain a license.

The license required is alleged to be that required by the ordinances of the city of New York, and by the rules and regulations of the board of health of the city of New York, of which we will, for the reasons hereinbefore assigned, take judicial notice.

■ The defendants did not, in their brief, specifically refer to what are called counts 6 to 23, both inclusive; but the demurrer generally covers them.

■ The numbering of the counts 6 to 23, inclusive, and then without separate allegations, but in one paragraph only, charging eighteen separate sales without inspection, not allocating any particular sale to any particular count, is in effect to charge eighteen separate distinct offenses in one count. No one can tell which one of the sales is charged under any particular count, and the defendants are put in the position where they cannot defend as to any particular offense, under any one count, but must defend as to eighteen separate defenses. If duplicity was sought to be avoided by simply enumerating the numbers of the so-called counts, while alleging all offenses together, then that object was not accomplished, as the manner in which it is alleged is duplicitous.

Each count of an indictment must in and of itself charge a crime, and you cannot charge eighteen crimes in one count by simply giving that count eighteen numbers. Any such method of pleading is too vague and general to be pleaded as res judicata or former jeopardy.

This error is not one merely of form and therefore to be ignored, under Revised Statutes, § 1025 (18 U. S. C. § 556 [18 USCA § 556]), but is an error which greatly prejudices the defendants.

It is to be noted that a separate and distinct offense, arising out of the same circumstances which form the basis of the so-called counts 6 to 23, both inclusive, is properly pleaded in the fifth count.

Except as to that portion of the indictment denominated as sixth count to twenty-third count, both inclusive, making eighteen in all, and the fortieth count, the indictment is not defective on any of the grounds specified in paragraphs 2, 5, 6, 9, 10, 11, 13, and 18 of the demurrer.

The demurrer is sustained as to that portion of the indictment denominated as sixth count to twenty-third count both inclusive, being eighteen counts in all, and to the fortieth count, for the reasons hereinbefore assigned, and the demurrer is in all other respects, and as to all other counts, overruled.

Settle order on one day's notice.